[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is an action instituted by the husband Kenneth Coleman against his wife Pamela Coleman seeking a dissolution of their marriage. One of the parties has resided in the State of Connecticut for more than one year prior to the bringing of this action and the court has jurisdiction over the marriage and the parties. Neither party has been a recipient of public assistance during the period of the marriage. The parties were married on CT Page 13163 April 7, 1973. The parties have two children, Alison who is twenty years old and Matthew who is fifteen years old. The parties' marriage has broken down irretrievably. There is no reasonable hope of reconciliation, and the court orders a dissolution of the marriage.
The court has carefully considered the statutory criteria for the granting of a dissolution of marriage, the awarding of custody, visitation, child support, alimony, and attorney's fees, and the dividing of the parties' assets and liabilities. The court makes the following findings and orders.
As previously indicated, the parties have been married for twenty five years. The husband is fifty four years old. He graduated from Yale College in 1996 and received an M.B.A. from Harvard Business School in 1969. The wife is 43 years old. She is a graduate of Vassar College. After their marriage in 1973 the parties moved to Chicago where the husband became a marketing manager at Wilson Sporting Goods. Thereafter the parties moved three times — to Tennessee, to Chicago, and then to Philadelphia — following the husband's job and career opportunities.
In 1984, the parties moved to Dromara Road, Guilford, Connecticut and the husband obtained a position as the Vice President and Division Manager for Times Fiber Corporation. Thereafter, the husband held three other positions: in 1986 he was President and CEO of Savage Industries, a Springfield, Massachusetts company that went bankrupt; in 1988 he was President of Echelon Sports/Bell Sports Company located in Providence; and in 1996 he was President of Trophy Holdings. While at Echelon Sports, the husband led the company through a merger and a public offering, which in 1992 earned him more than $2,000,000 in salary, bonus and stock option compensation. During the time period from 1984 to 1996, the husband maintained apartments near his employment located in Springfield, in Providence, in California and then in New York state.
In January 1997, the husband was terminated from his position at Trophy Holdings and he began consulting work with Lexitech, located in Branford, Connecticut. In April of 1998, he accepted a $10,000 per month job with Lexitech. At Lexitech, the husband is working on a business plan to increase the company's size and performance, which if successful, may result in additional compensation and benefits to him. He simultaneously is looking for other job opportunities. CT Page 13164
In the early part of the marriage, the wife worked in positions such as a librarian, but after the birth of Alison in 1978, she stopped working on any regular or full time basis. Thus, for most of the marriage she primarily cared for the home and the children, and the husband was the primary wage earner. The husband clearly has a greater earning capacity than the wife. The husband also provided the more significant economic and financial contribution to the marriage, but it is important to note that the wife received a $175,000 inheritance from her father's estate which she entirely spent during the marriage. Both parties are in good health, except that the wife has a speech impediment, which can seriously affect her ability to communicate orally. This speech problem could adversely affect her ability to work well in an area requiring constant or significant, oral communication skills. However, no evidence was provided indicating that this problem or any other precludes the wife from pursuing some type of full time employment.
The parties have substantial assets and expenses, and relatively minimal liabilities in the amounts as identified and listed on their financial affidavits. The court has reviewed this evidence, but as these matters are not in dispute, the court will not describe them in detail and will proceed to the primary areas of controversy between the parties.
The parties disagree about the cause for the breakdown of their marriage. Both parties agree that they had substantial disputes over child rearing issues, the husband's time in the home, and the family's finances. The husband claims that the wife was irresponsible with the family's money and that her extravagant excesses forced him to seek a divorce. She was unable to remain on a budget, accumulated substantial debt, and spent the entire inheritance from her father's estate. The wife on the other hand, insists that her husband was dissatisfied with and complained about her communication skills, dress and physical appearance. They had difficulty communicating with each other and their sexual relationship was not good. The husband admits that he had an affair with a co-worker in or about 1991. The wife also complained about the extended time periods that the husband was away from the home working, making her responsible for the household, depriving her of an involved husband, and depriving the children of an involved father. CT Page 13165
The testimonies of both parties focused on the parties' dispute about the family budget. As previously stated, the husband's view is that the wife spent money so excessively that she became an extravagant jet-setter. On the other hand, the wife insists that the husband made her responsible for most of the household expenses, but did not give her with enough money to provide for the family's monthly needs. As a result, she was required to satisfy the financial demands by accumulating debt and exhausting her inheritance, being unable to speak to him about the severity and pressure she was under because these discussions when they occurred would usually become heated arguments.
The court finds that there were numerous difficulties in the parties' marriage, but their dispute about the family finances and their inability to communicate effectively about this problem ultimately caused the irretrievable breakdown of their marriage. This cause for the irretrievable breakdown of the marriage must be attributed to both parties because they both were unwilling or unable to explain to the other the full scope of their concerns in an effective, productive manner. The husband could not understand how the wife could not remain within the family budget in light of the bills which he did pay and the money he made available to her; and the wife could not understand why the husband was not being more financially supportive in light of the income he was earning. On balance, the court finds some greater merit to the husband's position on this particular issue, but in evaluating the evidence in its entirety, this finding is certainly not sufficient enough to place the cause of the marital breakdown primarily on the wife as advanced by the husband.
The second major dispute between the parties is whether the financial awards in this case should be premised on the husband's present income or his earning capacity. Excluding 1992 when the husband earned over $2,000,000, his income between 1990 and 1997 ranged from a low of about $100,000 in 1995 to a high of about $354,000 in 1996. His average income during this time period was approximately $222,600 (excluding 1992). Thus, his historical earnings are significantly more that the $120,000 per year that he is presently earning. Nevertheless, the court rejects the wife's argument that alimony to her should be based primarily on an earning capacity attributed to the husband and agrees with the husband that her claim for $100,000 a year in alimony is unreasonable. The husband was fired from his former employment and there is no credible evidence that he has voluntarily reduced CT Page 13166 his income or is not taking reasonable steps to acquire employment commensurate with his abilities. The court also rejects the wife's related claim that the husband's greater earning capacity requires her to receive a significantly greater proportion of the property distribution. The court again agrees with the husband that a fair evaluation of all the criteria under Section 46b-81 of the General Statutes, fails to support the property distribution as advanced by the wife. The court is satisfied that the alimony and property distributions ordered by the court below fairly consider the husband's greater earning capacity as well as the other factors under Sections 46b-81 and46b-82.
 FINAL ORDERS
l. The parties' marriage is hereby dissolved.
2. The parties shall have joint legal custody of the minor child, Matthew Coleman and the wife shall have primary physical custody. The husband shall have reasonable and liberal visitation and parenting time with Matthew, which time shall include the following:
a) Alternate weekends from 4:00 p. m. on Friday through Sunday evening until at least 6:30 p. m., with Matthew having the discretion to decide whether to remain with his father over night on Sunday or return to his mother's residence on Sunday evening.
b) On Friday of each week that the husband does not have weekend visitation from 4:00 p. m. until 12:00 noon on Saturday.
c) On Wednesday of every week from 4:00 p. m. until at least 9:30 p. m., with Matthew having the discretion to decide whether to remain with his father over night on Wednesday or return to his mother's residence on Wednesday evening.
d) In odd-numbered years Christmas Day and Easter.
e) In even-numbered years on Christmas Eve and Thanksgiving.
f) School year visitation as follows, (excluding the Christmas Vacation week): The first, week long school recess (which shall include any regularly scheduled weekend visitation with the father). The mother shall spend the second, week long school recess with Matthew, which shall extend from the Sunday CT Page 13167 after the last school day to the following Saturday, to the exclusion of any regularly scheduled visitation with the father.
g) A two week period during the month of July each summer, the precise dates to be furnished by the husband to the wife by April 1 of each year (with a two week period of vacation to be spent between Matthew and his mother during the month August each summer, the precise dates to be furnished by her to the husband by April 1 of each year).
h) The parties shall cooperate and mutually agree for the father to have visitation on a shared basis on special occasions such as birthdays, Father's Day, and Mother's Day.
This visitation schedule may be modified by mutual agreement of the parties, and the parties shall cooperate to accommodate necessary changes as may arise due to the conflicting schedules of the parties and Matthew.
3.The husband shall pay to the wife child support in the amount of $17,000 per annum, payable monthly (or $1458.34 a month) until Matthew becomes 19 years old or graduates from high school, whichever occurs first. The husband shall provide medical insurance coverage for the minor child and the parties shall divide the cost of any uninsured and unreimbursed medical, dental or health related expenses of the minor child, with the husband paying two-thirds of such expenses and the wife paying one-third.
4. The husband shall pay alimony to the wife in the amount of $40,000 per annum payable monthly (or $3,333.34 a month). In addition to this alimony, when the husband's gross income equals or exceeds $150,000 ( as indicated on line 22 of his federal income tax return or its equivalent) he shall pay an additional amount of alimony equal to 10% of this total yearly gross income as follows. Beginning April 30, 1999 and for applicable years thereafter, the husband shall complete his federal income tax return or an estimate of his previous year's gross income, and if his gross income equals or exceeds $150,000, he shall pay the wife 10% of this gross amount in 12 equal, monthly installments over the next year beginning in June of that year in addition to paying the $3,333.34 a month. The husband's obligation to pay alimony shall terminate upon the death of either party, the wife's remarriage, or the wife's cohabitation as defined by statute. By April 30th of every year beginning in 1999, the parties shall exchange individual income tax returns. CT Page 13168
5. The parties shall divide equally their assets including real estate, securities, bank accounts, deferred compensation, pension and IRA accounts, and similar assets. The division of the deferred compensation or pension accounts shall be accomplished by Qualified Domestic Relations Plans or such other documents consistent with the terms of the accounts, shall provide for joint division with rights of survivorship, and shall be prepared by the husband's counsel. In the wife's fifty percent share shall be the marital residence at 313 Dromara Road, Guilford, Connecticut; the husband shall transfer all his interests in this property to the wife and the wife shall hold him harmless and indemnify him for any and all expenses and liabilities relating to this property. In the husband's fifty percent share shall be his residence at 113 Sam Hill Road, Guilford, Connecticut which he shall own to the exclusion of any claims or interests of the wife. The parties shall reasonably cooperate to accomplish this property division and the court will retain jurisdiction for this purpose.
6. Each party shall continue possession of the personal property and effects presently in his or her possession. Each party shall be responsible for his or her debts. Each party shall pay his or her own attorney's fees.
7. The wife shall be entitled to the benefit of COBRA benefits with regard to the husband's medical and dental insurance and he shall cooperate in making such available at the wife's sole cost.
So ordered.
This 12th day of November 1998.
Stevens, J.